BAILES, Judge Pro Tem.
Plaintiff, Sam P. Tantillo, sued Foster Wheeler Corporation, his employer, and Liberty Mutual Insurance Company, the employer’s insurer, for workmen’s compensation benefits, including statutory penalties and attorney’s fees, allegedly due for an injury to his right knee he sustained on July 6, 1966. Plaintiff alleges he is totally and permanently disabled within the meaning of the Workmen’s Compensation Act.
Defendant insurer paid plaintiff workmen’s compensation benefits at the then maximum rate of $35.00 per week, beginning July 13, 1966, and continuing through December 4, 1966, thereafter, the insurer paid reduced benefits of $10.00 per week through November 28, 1968. Additionally, the insurer paid plaintiff’s medical expenses in the amount of $783.70.
Neither the injury nor coverage is in dispute. The sole issue is whether plaintiff’s disability continued beyond the time during whi'ch benefits were paid.
The trial judge rendered judgment in behalf of plaintiff for $35.00 per week from July 6, 1966, through December 3, 1969, subject to a credit in the amount of $1,750.00 previously paid.
Defendants have appealed and the plaintiff answered the appeal, asking that benefits be increased and that penalties and attorney’s fees be awarded.
As this Court said in Square v. Liberty Mutual Insurance Company, 270 So.2d 335, 338 (La.App. 1st Cir. 1972), writ ref., 273 So.2d 41 (La.1973):
“Medical testimony in a workmen’s compensation case is of primary importance in determining claimant’s disability. If there is no conflict of the medical testimony, then the lay testimony should not be considered by the court.”
The initial inquiry, therefore, must be into the medical evidence in the record of this proceeding.
Plaintiff was first treated by Dr. A. B. Cronan, Jr., a general practitioner; however, neither side produced any evidence from Dr. Cronan, and it was stipulated that no adverse presumptions should be drawn against either side for failing to call this doctor as a witness.
Apparently, Dr. Cronan immediately referred the plaintiff to Dr. Alvin Stander, an orthopedic surgeon of Baton Rouge, Louisiana. By agreement, four medical reports from Dr. Stander were introduced in evidence. On the date of the injury, July 6, 1966, Dr. Stander made an initial diagnosis of medical ligament strain. After treating plaintiff conservatively from July 6, 1966, to September 20, 1966, without appreciable benefit, Dr. Stander concluded there was internal damage that required surgical intervention. On September 26, 1966, the right knee joint was operated and a torn cartilage removed. Less than one month later, Dr. Stander found that the plaintiff was progressing satisfactorily, and stated that he should be able to return to work in two to four weeks.
The final report of Dr. Stander, dated March 1, 1967, is vital to disposition of this litigation, and we quote the report in full:
“I saw Sam P. Tantillo on November 9 at which time he was improved. On November 23 his condition was very satisfactory and he was capable of returning to work on a gradual basis at that time. He was to return only if he had some difficulty. I have not seen him since his last visit in November.
“Mr. Tantillo is capable of doing the type work he was doing at the time of his injury. Excision of the medial men *918 iscus rates a S per cent disability of the extremity.” (Emphasis added.)
There is no evidence that plaintiff saw Dr. Stander at any time after November 23, 1966.
The next series of medical examinations were performed by Dr. George C. Batta-lora, Jr., also an orthopedic surgeon. Plaintiff was seen by Dr. Battalora on three occasions, January 1, 1967, May IS, 1967, and June 30, 1967. Dr. Battalora testified by way of deposition. The most pertinent part of his testimony is the following:
Q. Didn’t you feel that he was able to return to work, the kind that he was doing when he was injured, at that time that you saw him, but with the functional impairments that you referred to as a permanent disability in your first report, I believe that was ten percent of the leg ?
A. I felt — I wouldn’t think that a ten percent impairment to the leg on the basis of a meniscectomy and chon-dromalacia, that increase in the knee would prevent him from doing work eventually as a carpenter.
Q. In other words, you felt that he should be able to go back to work as a carpenter, and as of when did you feel that?
A. Well, I really felt that he could resume work, I think pretty early in the game when I was seeing him. But I had limited — I had placed restrictions on this situation.
Q. I am talking about, you know, when he would be able to go back to doing what a fifty-six year old man can do with some arthritic changes.
A. On all three occasions I had recommended nonhazardous situations. Now, he was improved at the time of the last visit. And if all of the joint swelling had been completely cleared one month from then I would have let him go back to all of the activities. I did not see him that following month.
Q. It was your opinion then when you last saw him in about a month he would be able to go back to work?
A. Yes.
Q. For work?
A. Yes, I would probably agree with that.
Q. Okay. Now, did the x-rays of his knee show anything that alarmed you as an orthopedist about him, sir?
A. For a patient of fifty-six I would not think so. No sir.
From a standpoint of evaluation of the medical evidence in this case, we are denied any further medical opinion of Dr. Battalora as plaintiff did not return for the one additional visit which could have settled with certainty of whether plaintiff had recovered. This physician was selected by the plaintiff, who bears the burden of proving his disability, and plaintiff must suffer the adverse effect of his own doctor’s prognosis.
One other orthopedic surgeon, Dr. Byron M. Unlcauf, was deposed on behalf of the plaintiff. Dr. Unkauf saw the plaintiff only once, on December 3, 1969. This doctor testified:
“I felt that the above (the plaintiff) has a patella femoral chrondromalacia, which has been aggravated by his injury and subsequent surgery of July 6th, 1966. He now has minimal residuals. It is noted that there is some minute calcification seen in the knee joint, and these could be joint dust. At the present time, he has a ten to fifteen percent permanent disability of the right knee as a result of his alleged injury and subsequent surgery.”
*919 However, on further questioning by-plaintiff’s counsel, the following exchange occurred:
Q. Doctor, do you think that the man at this time would be able to perform all the duties of a journeyman carpenter, including climbing and working from scaffolds?
A. Well, I would say that on the single examination that I have done of this man, with no fluid in the knee joint and a history of roughly three years and some months, that he should be able to do the greater portion of his carpentry work, only having had a cartilage removed. But with some crepitation in his knee joint, which is attributable to wear and tear and his age, which would give him troubles on occasion.
Considering the plaintiff’s medical evidence, and construing the same in the light most favorable to plaintiff, we are simply unable to conclude that plaintiff has proved his case for total and permanent disability. Dr. Stander, the physician most intimately connected with the case, states that plaintiff is able to perform the type work he was performing at the time of his injury. Dr. Battalora felt that within one month of the last visit (June 30, 1967) the plaintiff could resume all activities if all swelling was gone. Dr. Unkauf apparently found no swelling some two and one-half years later. There is no substantial conflict in the testimony of these three doctors. This medical evidence does not support a finding of total and permanent disability on the part of the plaintiff. Therefore, under the doctrine of the Square case, we find that we are precluded from considering the lay testimony offered by the plaintiff in an effort to make out his claim. Consequently, the trial judge committed manifest error in relying on the lay testimony to support his findings of total and permanent disability through December 3, 1969.
The plaintiff was totally disabled for a time, and entitled to maximum benefits for that period. Giving full effect to the evidence of Dr. Stander, and the most favorable inferences therefrom for the plaintiff, we are of the opinion that the plaintiff’s total disability existed no later than the date of his last report, March 1, 1967. Maximum benefits of $35.00 per week were paid by the defendants only through December 4, 1966, with reduced (minimum) benefits thereafter. We thus feel the plaintiff is entitled to be awarded maximum benefits, subject to credit for payments made, through March 1, 1967.
We hold that plaintiff has established a permanent partial loss of function to his right leg, within the meaning of La. R.S. 23:1221(4) (o). However, under the jurisprudence of this State, where a claimant suffers partial permanent disability and the impairment of the use of a bodily member, he is entitled to recover either for the disability or the loss of the bodily member, which ever would produce the greater amount. Ben v. Starns-McConnell Lumber Company, 243 So.2d 77, 80 (La.App. 1st Cir. 1971). Under the provisions of La.R.S. 23:1221 (4)(o), this plaintiff would be entitled to compensation benefits for a maximum of 175 weeks, at the then statutory minimum of $10.00 per week, or total benefits of $1,750.00. It is obvious that this sum exceeds the maximum compensation to which we have ruled the plaintiff entitled for his temporary total disability, thus his compensation should be based upon La.R.S. 23:1221 (4)(o), rather than under the provisions of La.R.S. 23:1221(3).
The defendants having paid benefits of $1,750.00, and all medical expenses, plaintiff is entitled to no additional workmen’s compensation.
For the reasons assigned, the judgment of the trial court is reversed. All costs are assessed against plaintiff-appellee.
Reversed.